IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**WOODWORKER'S SUPPLY, INC.,**
a Wyoming Corporation

       Plaintiff-Counterclaim Defendant,

       vs.                                           **No. CIV 99-796 LCS**

**LOS ALAMOS TECHNICAL ASSOCIATES,
INC.,**

       Defendant-Counterclaimant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court on Defendant's Motion for Partial Summary Judgment *(Doc. 50)*, filed June 1, 2000. The Court has considered the motion, the memoranda of the parties, and the relevant law. The Court finds the motion to be well taken in part, and it shall be granted in part and denied in part.

**Factual Background**

This case arose out of three contracts between Plaintiff and Defendant (or Defendant's predecessor in interest, Correa Enterprises, Inc. ("Correa")) for the design and development of an e-commerce web site. The first contract, entered into effective February 26, 1998, (hereinafter referred to as "first contract"), required Correa to perform a web site requirements analysis and to prepare a detailed site diagram schematic and list of recommendations for hardware and software

1

for the desired web site.  *See* Ex. G to Def.'s Mem. *(Doc. 52)*.  The terms of this first contract provided that Plaintiff was to pay Correa $85.00 per hour, not to exceed $5,000.00, plus gross receipts tax.  *See id.*  Correa delivered a document entitled "Requirements Specification for Woodworkers Supply Web Site Version 1.0" to Plaintiff on or before March 29, 1998.  *See* Ex. H to Def.'s Mem. *(Doc. 52)*.  Plaintiff's president signed the requirements specification document as "Approved" on March 29, 1998.  *See id.*  Correa submitted an invoice for $4,998.00 plus gross receipts tax on March 27, 1998, and Plaintiff paid the invoice.  *See* Ex. I to Def.'s Mem. *(Doc. 52)*

On March 26, 1998, Plaintiff and Correa entered into a second contract.  *See* Ex. J to Def.'s Mem.  This contract, entitled "Web Site Development Agreement" (hereinafter referred to as "second contract"), provided that Correa would complete certain web site design, implementation and development services and deliver certain software and documents, in exchange for a fixed price of $93,160.00 plus gross receipts tax.  *See id.*  This second contract provided that an acceptance test plan would be developed by Correa and approved by Plaintiff.  *See id.*  Plaintiff agreed in the contract that it would accept the web site software if the software passed the tests in the acceptance test plan.  *See id.*

Defendant purchased the assets of Correa's software engineering division, and assumed Correa's obligations under the second contract, on April 24, 1998.  *See* Def.'s Ex. P.

On September 2, 1998, the parties mutually agreed on an acceptance test plan.  *See* Ex. K to Def.'s Mem.  The software passed the tests specified in the test plan, and the software and the other deliverables under the second contract were turned over to Plaintiff on or about October 14, 1998.  *See* Exs. K, L, O to Def.'s Mem.  The second contract contained a 90-day warranty clause

and a ten-day period within which Plaintiff could reject any deliverable that did not meet its specifications. *See* Def.'s Ex. J at ¶¶ 2, 3. Plaintiff paid the invoice for the second contract on November 19, 1998, and did not reject any deliverable or make a warranty claim during the 90-day period. *See* Pl.'s Ex. G at Depo. Ex. 25; Def.'s Ex. A at 54.

The web site did not go on line at the conclusion of the second contract because of certain performance limitations or other deficiencies. Plaintiff presents evidence that these deficiencies were known to both parties at the time of completion of the second contract, and both parties recognized that the web site product was not ready to be used as an e-commerce site at that time despite the fact that the web site passed the acceptance test. *See* Pl.'s Ex. F at 27, Pl.'s Ex. G at 88, attached to Pl.'s Mem. *(Doc. 67)*; Def.'s Ex. R at 1. Instead, Plaintiff and Defendant entered into another Web Site Development Agreement on December 14, 1998 (hereinafter "third contract.") *See* Ex. Q to Def.'s Mem. Unlike the fixed-price second contract, the third contract provided that the services would be performed on a "time and materials basis." *Id.* at ¶ 3. Plaintiff agreed to pay Defendant $70.00 per hour for the services of a "Web Developer" and $110.00 per hour for the services of the Project Manager, plus gross receipts tax. *See id.* Defendant agreed to provide weekly status reports, planned tasks for the following week, and report the number of hours expended per task and estimated number of hours to complete each task. *See id.* at ¶ 4. Defendant also agreed to process project change order requests, including estimating cost and impact on the schedule, and Plaintiff's project manager was authorized to approve all change requests. *See id.* Plaintiff had the right to terminate the third contract for any reason on ten days' notice, while Defendant had the right to stop work if payment was not received within 30 days after receipt of any invoice. *See id.* at ¶ 5.

3

Prior to the beginning of the third contract, on or about October 26, 1998, Defendant submitted two revision proposals for tasks to be performed under the third contract. *See* Def.'s Ex. R. The first option, consisting of eleven tasks, had an estimated cost of $49, 980. *See* Pl.'s Ex. C at Depo. Ex. 26. The second option consisted of completing only six of the eleven tasks, at an estimated cost of $27,790. *See id.* The parties dispute whether these estimates were immaterial preliminary estimates that were superseded by the third contract, *see* Def.'s Ex. D at 79-80, or were representations of estimated final cost of the third contract made by Defendant to induce Plaintiff to enter into the third contract, *see* Pl.'s Ex. G at 340, 344. Defendant's internal estimate of the value of the third contract, made about December of 1998, indicates $120,000. *See* Pl.'s Ex. H at Depo. Ex. 49.

By early February 1999, Defendant encountered a number of difficulties in completing the tasks specified in the third contract, and realized that substantial portions of the original web site code would have to be rewritten. *See* Pl.'s Ex. H at Depo. Ex. 11. By the end of May 1999, Plaintiff had been billed $106,186.54 for tasks performed under the third contract. *See* Pl.'s Ex. G at Depo. Ex. 25. On June 18, 1999, after approximately another $19,000 of work in progress had been performed on the third contract, *see id.*, Defendant submitted a proposal to complete the web site in nine more weeks for a fixed price of $49,520. *See* Pl.'s Ex. H at Depo. Ex. 19. Plaintiff terminated the third contract and refused to pay the final three invoices, amounting to $76,429.41. *See* Pl.'s Ex. G at Depo. Ex. 25.

During all of the second and third contracts, Plaintiff had computer programmers on its staff who reviewed and made recommendations concerning the progress of the web site development, whether to accept or reject deliverables, and whether or not Plaintiff should enter

4

into the third and a possible fourth contract.  One of Plaintiff's programming employees, Eric Stewart, had considerable expertise in web site design, and recommended that the project be done in-house. Mr. Stewart was responsible for overseeing the development of the web site by Defendant and recommending acceptance or rejection of the web site that was delivered under the second contract.

Plaintiff complains that Defendant failed to submit weekly performance reports and change orders as required by the third contract.  As a result, Plaintiff alleges that it was misled into believing that substantial progress was being made to complete the third contract when, in fact, little progress had been made.  Plaintiff also alleges that Defendant failed to properly itemize its employees' time on a task by task basis, and therefore it was impossible to verify that the number of hours of services billed was actually devoted to the project.

Plaintiff is seeking $560,000 for lost profits.  Plaintiff alleges that Defendant's delays in completing the web site cost it considerable lost sales, and presents evidence that for the twelve months ended May 31, 1999, its gross profit on additional sales after direct costs of sales amounted to 28.87%.  *See* Pl.'s Ex. N.  Plaintiff also presents evidence that its annual sales have declined over the past two years by a total of some ten million dollars.  *See* Def. Ex. U at 4. During this period, Plaintiff claims that its competitors were selling goods over their web sites, but Plaintiff could not do so because of Defendant's delays in completing the web site.  Plaintiff's president John Wirth, Jr., based on his experience over 27 years and various marketing publications, estimated a five percent sales increase would result from internet sales.  *See* Pl. Ex. G at 239-43; Pl. Ex. I.  Thus, Plaintiff alleges a loss of $2 million in sales (from loss of existing customers to competitor's web sites and lost opportunity to obtain new customers) and $560,000

in lost profits from a one-year delay. Plaintiff's estimate of $2 million in lost sales is five percent of its existing annual sales, or one-fifth of the decline in annual sales during the period when it did not have an operational web site while its competitors were marketing on line.

Plaintiff raises six causes of action: breach of contract, violation of the New Mexico Unfair Practices Act, fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and rescission and restitution. Defendant brings a counterclaim for breach of contract, seeking to collect payment for the final three invoices on the third contract. Defendant has moved for partial summary judgment on all claims except the fraud claim. In addition, Defendant seeks summary judgment on Plaintiff's claims for lost profits on the grounds that any damages for lost profits are too speculative to be awarded.

**Analysis**

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the non-moving/opposing party." *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1996). However, the party opposing summary judgment must come forward with sufficient evidence upon which a reasonable jury could find a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

1.  Breach of Contract Claims

Defendant argues that summary judgment is appropriate on the breach of contract claims because Defendant did not breach any of the three contracts. Plaintiff does not point to any breach of the first contract; therefore, summary judgment is appropriate for Defendant on breach of contract claims related to the first contract.

As to the second contract, the only breach that Plaintiff identifies is the date of delivery. Plaintiff alleges that the software under the second contract was delivered 33 days late. Defendant argues that the delivery date was not a material term of the second contract, that the breach was *de minimis*, that any technical breach was excused when Plaintiff accepted the deliverables and paid the invoice without objection, and that no damages resulted from any delay because Plaintiff decided not to put the web site on line at the conclusion of the second contract.

Under New Mexico law, acceptance of goods or services after the deadline for delivery does not waive damages that may be recovered due to the delay. *See Continental Life Ins. Co. v. Smith*, 41 N.M. 82, 91 64 P.2d 377, 384 (1936). However, a party may waive a breach of contract relating to late delivery by manifesting its willingness to extend the time of performance. *See Sundt v. Tobin Quarries, Inc.*, 50 N.M. 254, 264-65, 175 P.2d 684, 690-91 (1946). Defendant presents evidence that Plaintiff agreed to an acceptance test plan and participated in the acceptance test at the time of delivery without any objection. Plaintiff presents no evidence that it ever complained about delivery of the software being made after the deadline. Under these circumstances, I find that Plaintiff's concurrence in the acceptance test plan, and participation in the acceptance tests without objection as to the date, is a manifestation of its willingness to extend the time of performance. Therefore, summary judgment will be granted to Defendant as to the second contract.

I reach a different conclusion as to the third contract. There are material facts in dispute concerning whether Defendant informed Plaintiff of its work progress under paragraph 4 of the third contract, secured approval for changes in the scope of the work as contemplated by paragraph 4, and delivered the services that it invoiced. In particular, Plaintiff presents substantial evidence that Defendant's employees did not keep track of time on a per-task basis, and that Plaintiff was not informed of the lack of progress being made. I find that these disputed facts preclude summary judgment as to the breach of contract claims with respect to the third contract.

 2. Unfair Practices Act

Plaintiff alleges that Defendant engaged in unfair or deceptive trade practices in violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-3. In particular, Plaintiff alleges that Defendant represented that the software delivered under the second contract would meet Plaintiff's goals in developing the web site, that the software delivered under the second contract was of a particular standard or quality (i.e., a commercially usable web site), and that Defendant misrepresented the cost of the third contract as being less than $50,000 when in fact Defendant made an internal estimate of its final cost as $120,000.

Defendant argues that because each of the three contracts contain integration and disclaimer of warranty clauses, there can be no representations under the New Mexico Unfair Practices Act other than those expressly contained in the written contracts. Defendant points to *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 101 N.M. 798, 689 P.2d 1269 (1984) for the proposition that a written contract disclaimer that is effective under the Uniform Commercial Code negates actions based on misrepresentation as well as breach of warranty. The *Rio Grande Jewelers* holding was based on the specific context of the case, and held that whether

a warranty disclaimer in an integrated written contract would preclude negligent misrepresentation actions in tort where two commercial entities entered into a contract, the transaction was undertaken at arm's length without undue influence, and the warranty disclaimer was specific and in bold type. *See id.* at 800, 689 P.2d at 1271. In that case, the court noted that allowing an action for negligent misrepresentation would "circumvent the operation of the Uniform Commercial Code and . . . allow the contract to be rewritten under the guise of an alleged action in tort." *Id.*

Plaintiff notes that Defendant has admitted that there is a material issue as to Plaintiff's fraud claim. Because any fraud claim would necessarily state a claim for violation of the Unfair Practices Act, Plaintiff contends the Unfair Practices Act claim must remain. Plaintiff also notes that the *Rio Grande Jewelers* case does not deal with the Unfair Practices Act, and therefore it is inapplicable to this claim.

I agree with Plaintiff that its claim that it was induced to enter into the third contract based on an alleged knowing misrepresentation as to ultimate price states a claim under the Unfair Practices Act. However, Defendant is correct that to the extent the Unfair Practices Act claims are essentially warranty claims, they are precluded. Although *Rio Grande Jewelers* is not an Unfair Practices Act case, its rationale is applicable: where there is an express written limitation or disclaimer of warranty that would be effective in an integrated contract between two commercial entities, there can be no pre-contract "representation" in conflict with the disclaimer that gives rise to a separate cause of action. Thus, the more specific warranty limitation provisions and contract terms must supersede any of the more general implied representations that give rise to the Unfair

9

Practices Act claims concerning the first and second contracts. Therefore, summary judgment will be granted in part and denied on part on the Unfair Practices Act claims.

      3.  Breach of the Covenant of Good Faith and Fair Dealing

New Mexico recognizes that every contract imposes an implied duty of good faith and fair dealing on the parties. *See Watson Truck & Supply Co. v. Males*, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990). However, the implied covenant of good faith and fair dealing will not override express provisions addressed by the terms of an integrated written contract. *See Melnick v. State Farm Mut. Ins. Co.*, 106 N.M.726, 731, 749 P.2d 1105, 1110 (1988). In other words, courts will not allow a dissatisfied party to a contract to rewrite its terms under the guise of the implied covenant of good faith and fair dealing. *See id.* at 732, 749 P.2d at 1111.

      With respect to the first and second contracts, Plaintiff argues that LATA's predecessor, Correa, wrote the specifications in such a vague and subjective manner that a poorly performing web site could still meet the specifications. Plaintiff also argues that Defendant exhibited bad faith by failing to specify a computer language or identify personnel to staff the project, thereby allowing the software in the second contract to be written in the Perl language by programmers who lacked experience. I find this argument unpersuasive. Without deciding whether LATA is liable for any bad faith exhibited by Correa, I find that Defendant did not breach the covenant with respect to the first and second contracts. There is no dispute that Defendant's deliverables under the first two contracts met all of the specifications under the contract. Also, Plaintiff's own officers and computer programmers participated in developing and negotiating the acceptance test plan for the second contract, and signed off on the acceptance test results after observing the tests. *See*, *e.g.*, Def.'s Exs. M, K at 23. Plaintiff presents no evidence that the choice of Perl was

made in bad faith to prevent successful completion of the project. Plaintiff or its programmers could have insisted that the software be written in a particular language as an express provision, but chose not to do so. Plaintiff did not object to the deliverables under the first two contracts prior to delivery or during the warranty period even though it had its own computer experts involved in the project. This court will not rewrite these contracts to include additional requirements not originally included. Therefore, summary judgment will be granted to Defendant on the implied covenant claims concerning the first and second contracts.

As to the third contract, I find that Defendant is not entitled to summary judgment on the covenant of good faith and fair dealing claims. A party to a contract may be under the affirmative duty to disclose material information in order to prevent the denial of the other party's rights under the contract. *See Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 127 N.M. 1, 14, 976 P.2d 1, 14 (1998). In this case, Plaintiff presents evidence that Defendant was aware in February 1998 that large portions of software would have to be re-written, at considerable expense to Plaintiff. Plaintiff had the right to stop work on the contract at any time, with ten days notice. Viewing the evidence in the light most favorable to Plaintiff, Defendant chose to conceal the fact that Plaintiff would have to pay perhaps $120,000 or more to rewrite the software, thus preventing Plaintiff from being able to exercise its right to stop work on the contract before Plaintiff became obligated to pay large amounts for work in progress.

### 4. Negligent Misrepresentation

Plaintiff alleges that Defendant made a number of false or misleading representations that give rise to tort liability for negligent misrepresentation, in addition to any liability for breach of contract. These alleged misrepresentations include "representations that Perl would produce an

11

acceptable web site, that the Phase III work would cost less than $50,000, that Phase III would be complete by May 9, that Phase III would be complete by May 19, that Phase III would be complete by May 28, and the concealment of the decision to re-write the Phase II computer code in Phase III." *Pl.'s Response* (Doc. 67) at 26.

For the same reasons that were given the analysis of the Unfair Practices Act claims, I find that representations concerning the cost, estimated completion date, or estimated amount of work required to complete the third contract can give rise to a negligent misrepresentation claim. However, I find that representations concerning the first two contracts (as well as those in the third contract) that are in the nature of a warranty (such as any representation that Perl would produce an acceptable web site) cannot be the basis for a negligent misrepresentation claim because the more specific written contract and warranty terms must control.

### 5. Fraud

Defendant moves for summary judgment on any fraud claims related to the first and second contracts only. Plaintiff does not come forward with any evidence that could support a fraud claim as to the first contract; therefore, summary judgment is appropriate on that contract. Plaintiff also does not dispute Defendant's argument that it is not liable for any fraud committed by Correa under any successor liability theory.

As to the second contract, Plaintiff comes forward with evidence that Defendant's choice of the Perl language contributed to the deficiencies of the software, and that those deficiencies were well known. However, Plaintiff fails to come forward with any evidence that Defendant made any intentionally false statements concerning its use of Perl, or concealed any facts concerning. Furthermore, Plaintiff presents no evidence that it relied on any false representations;

in fact, the evidence shows that Plaintiff had its own computer experts, such as Eric Stewart, investigate this issue.  *See* Pl.'s Ex. B at 56-58.  Because Plaintiff cannot come forward with evidence on these elements of fraud, Defendant's motion for summary judgment will be granted with respect to the fraud claims concerning the first and second contracts.

### 6.  Damages for Lost Profits

Defendant argues that Plaintiff's alleged damages for lost profits are too speculative to be awarded.  Plaintiff's lost profit claims are based on the delay of approximately one year in getting its web site online that it attributes to Defendant's alleged misrepresentations.  Plaintiff claims that if its web site were online one year ago, it would have increased its sales by approximately five percent.  Plaintiff presents evidence that its gross profit less variable costs is 28.8% of sales; thus, a five percent increase in sales yields approximately $560,000 in profits.

Defendant's major objection to argument is that Plaintiff presents no evidence that its sales would increase by five percent if the web site were operational.  The five percent estimate was made by Plaintiff's president, John Wirth, Jr., based on articles in trade journals as well as his 27 years of experience.  *See* Pl. Ex. G at 241. Plaintiff presents evidence that its sales have decreased over the past two years as its competitors have placed web sites into operation.  Plaintiff estimates that web site sales would amount to 36% of total sales volume in a few years based on estimates of total sales for all online merchants.  *See* Def. Ex. A at 230-31.

Under New Mexico law, approximations may be used to calculate the extent of damages once the fact of damages is certain.  *See Eccher v. Small Business Admin.*, 653 F.2d 1388, 1392 (10th Cir. 1981).  Although its evidence may be thin, Plaintiff has introduced sufficient evidence that its sales would have increased if its web site were in operation.  Viewing the evidence in the

light most favorable to Plaintiff, there is a genuine issue as to whether Plaintiff's sales decline over the past two years was caused, at least in part, by its competitors introducing web sites. There also appears to be a genuine issue as to whether Plaintiff's sales would increase once its web site went into operation based on evidence of industry-wide trends and Mr. Wirth's testimony from his experience. There is also evidence that each additional dollar of Plaintiff's sales would yield approximately a 28% profit. Therefore, summary judgment will be denied at this time as to this claim.

**Conclusion**

WHERFORE, IT IS ORDERED that Defendant's Motion for Partial Sumamary Judgment *(Doc. 50)* is **granted in part and denied in part**. Summary judgment is granted to Defendant, and against Plaintiff, as to breach of contract, New Mexico Unfair Practices Act, breach of the covenant of good faith an fair dealing, negligent misrepresentation, and fraud claims concerning the first and second contracts. Summary judgment is denied as to those claims concerning the third contract.

IT IS FURTHER ORDERED that summary judgment is denied as to the claims for lost profits due to the delay in bringing its web site online.

_____
Leslie C. Smith
UNITED STATES MAGISTRATE JUDGE

F:\Brian\Opinions\99-796 sj.wpd